**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RIGHT TO BE, SOUTH ASIAN NETWORK, ST. BARNABAS SENIOR CENTER OF LOS ANGELES, ASIAN PACIFIC AMERICAN LEGAL RESOURCE CENTER,<br><br>    Plaintiffs,<br><br>    v.<br><br>PAMELA BONDI, in her official capacity as Attorney General of the United States, U.S. DEPARTMENT OF JUSTICE, MAUREEN HENNEBERG, in her official capacity as Acting Head of the Office of Justice Programs, OFFICE OF JUSTICE PROGRAMS, TAMMIE GREGG, in her official capacity as Acting Director of the Bureau of Justice Assistance, and BUREAU OF JUSTICE ASSISTANCE,<br><br>    Defendants. | Civil Case No.  25-cv-3676 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
AND VACATUR OF FINAL AGENCY ACTION**

Niyati Shah*
Noah Baron*
Shalaka Phadnis *
Alizeh Ahmad*
ASIAN AMERICANS ADVANCING
JUSTICE—AAJC
1620 L St. NW, Suite 1050
Washington, DC 20036
Phone: (202) 296-2318
nshah@advancingjustice-aajc.org
nbaron@advancingjustice-aajc.org
sphadnis@advancingjustice-aajc.org
aahmad@advancingjustice-aajc.org

Nimra Azmi (Bar No. 5466693)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone: (212) 489-8230
NimraAzmi@dwt.com

Kenneth E. Payson*
Christine McFadden*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1604
Phone: (206) 622-3150
KennethPayson@dwt.com
ChristineMcFadden@dwt.com

Anne Marie Tavella*
DAVIS WRIGHT TREMAINE LLP
188 West Northern Lights Blvd., Suite 1100
Anchorage, AK 99503-3985
Phone: (907) 257-5300
AnneMarieTavella@dwt.com

Megan Amaris*
Kendal Mitchell*
DAVIS WRIGHT TREMAINE LLP
50 California Street, 23rd Floor
San Francisco, CA 94111-4701
Phone: (415) 276-6500
MeganAmaris@dwt.com
KendalMitchell@dwt.com

*Counsel for Plaintiffs*

\* *Motion for admission* pro hac vice
*forthcoming*

## INTRODUCTION

1.      A little less than a year after passing the Jabara-Heyer NO HATE Act, 34 U.S.C. §
30507, as part of the COVID-19 Hate Crimes Act, in 2022, Congress initially appropriated
$5,000,000 for the creation of the Community-Based Approaches to Hate Crimes grant program
("Anti-Hate Crimes Grant Program" or the "Program") to be administered by Defendant U.S.
Department of Justice ("DOJ").

2.      By doing so in 2022, and again in 2023 and 2024, Congress was effectuating its
policy determinations, *inter alia*, that law enforcement's "collaboration with community-based
organizations is critical to combatting hate crimes and assisting victims and their families in
recovery."[1] As then-Judge Kavanaugh has ruled, "Congress speaks through the laws it enacts." *In
re Aiken Cnty.*, 725 F.3d 255, 260 (D.D.C. 2012). Defendant Office of Justice Programs ("OJP")
then awarded grants to dozens of community and national organizations, including to Plaintiffs.

3.      Plaintiffs Right To Be, South Asian Network ("SAN"), St. Barnabas Senior Center
of Los Angeles ("SBSS"), and Asian Pacific American Legal Resource Center ("APALRC")
(together, "Plaintiffs") applied for and duly received grants under this Program to address hate
incidents. In furtherance of their missions, Plaintiffs have built entire programs, staked their
reputations, and hired staff while relying on those funds. With these grant funds, Plaintiffs have—
as Congress intended—implemented or were in the process of implementing programs designed
to promote community safety by empowering community members to combat hate crimes and
other forms of bigotry. These efforts include APALRC partnering with law enforcement to deliver
Know Your Rights seminars to combat human trafficking, SBSS developing media campaigns to

---

[1] Letter from U.S. Representative G. Meng and U.S. Senator M. Hirono to Attorney General
Garland (May 18, 2022), https://meng.house.gov/sites/evo-subsites/meng-
evo.house.gov/files/Letter%20to%20Attorney%20General%20Garland.pdf

combat ant-elder hate, Right To Be creating bystander intervention trainings against LGBTQ hate, and SAN offering therapy to hate crimes victims.

4.      But on April 22, 2025, midstream of a three-year grant, Defendants abruptly and without justification dismantled the Congressionally created Anti-Hate Crimes Grant Program by the same mass-mailed boilerplate termination notices (which failed to offer any individualized explanation). Each of Plaintiffs' grants were part of this complete defunding, at a time when, despite the nation emerging from the pandemic-era overall spike in crime, the need to address serious criminal activities like hate crimes persisted.[2] Now more than ever, the promise of these collaborations between law enforcement and community organizations is essential. But as it has in numerous instances before, this Administration has usurped what is within the province of the legislative branch and, instead, prioritized its own policy preferences by dismantling an entire grant program properly created and funded by Congress.

5.      Plaintiffs bring this action under the Fifth Amendment Due Process Clause of the United States Constitution, the Constitution's Separation of Powers, the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.*, ("APA"), and the Declaratory Judgment Act, 28 U.S.C. § 2210, *et seq.*, ("DJA") to enjoin and declare unlawful the illegal dismantling of the Program, including Defendants' termination of Plaintiffs' individual grants.

## JURISDICTION AND VENUE

6.      This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. This action arises under the U.S. Constitution, the APA, 5 U.S.C. § 702, and the DJA, 28 U.S.C. § 2201. The United States has waived its sovereign immunity pursuant to 5 U.S.C. § 702. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court

---

[2] Solomon, A., & Pearl, B., *DOJ funding update: A Deeper Look at the Cuts*, Council on Criminal Justice (2025), https://counciloncj.org/doj-funding-update-a-deeper-look-at-the-cuts/.

may grant declaratory relief, injunctive relief, and other appropriate relief under 28 U.S.C. §§ 2201-02, 28 U.S.C. § 1651 and 5 U.S.C. §§ 705-06.

7.    Venue is proper under 28 U.S.C. § 1391(e)(1) because this action seeks relief against a federal agency and officials acting in their official capacity; at least one plaintiff resides in this district; and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## THE PARTIES

8.    Plaintiff Right To Be is a 501(c)(3) organization established in 2010 (formerly known as Hollaback!). Its mission is to build safe, inclusive public spaces by transforming the culture that perpetuates harassment and discrimination. Right To Be was awarded $400,000 in grant funding in FY 2023 to support a program called "Bystander Intervention to Prevent and De-escalate Hate-Based Violence Against LGBT+ Community Members in Texas." Defendants unlawfully terminated this funding on April 22, 2025. Right To Be is based in Brooklyn, NY.

9.    Plaintiff South Asian Network is a 501(c)(3) organization founded in 1990 with the mission to advance the health, wellbeing, and civil rights of South Asians in Southern California through education and empowerment. SAN offers a wide range of free services and workshops to Southern California's low-income South Asian immigrant community, including assisting seniors with public benefits enrollment, running United States citizenship application clinics, offering elder care support services, offering mental health and support group services, engaging in nonpartisan voter education, and supporting victims of domestic violence, sexual assault, and human trafficking. These programs are offered in multiple South Asian languages and also include translation services, such as translating legal documents and interpretation at medical appointments. SAN was awarded $400,000 in grant funding during FY 2022 to support its "Stop The Hate Project," which aimed to enhance anti-Asian hate crime awareness among South Asians

3

and provide resources to victims of anti-Asian hate crimes. Defendants unlawfully terminated this funding on April 22, 2025. SAN is based in Artesia, California.

10.    Plaintiff St. Barnabas Senior Center of Los Angeles d/b/a St. Barnabas Senior Services, is a 501(c)(3) organization founded in 1908 that provides senior support services throughout the Greater Los Angeles Area, focusing on low-income seniors with minimal English proficiency, many of whom are East Asian. SBSS's mission is to empower its diverse community of older adults to live and age with dignity and respect. SBSS's average client is in their mid-70s, speaks minimal English, lacks their own support system, and is dependent on Social Security. Support is offered to older adults at three senior centers, seven community meal sites (often providing the only hot meal seniors will receive that day), and at numerous other community facilities. SBSS also offers a host of programs, workshops, and services in languages most commonly spoken by their participants, including Korean, Vietnamese, Mandarin, Tagalog, Spanish, and Hindi. SBSS was awarded $400,000 in grant funding during FY 2024 to a project titled "Community-Based Approach to Hate Crimes Targeting the Older Adult Population in Los Angeles," which aimed to reach, educate, and empower older adults to advocate for themselves in response to the rise in hate crimes targeting this demographic. Defendants unlawfully terminated this funding on April 22, 2025. SBSS is based in Los Angeles, CA.

11.    Plaintiff Asian Pacific American Legal Resource Center is a 501(c)(3) organization founded in 1998 that seeks to advance the civil and legal rights of Asian Americans and Pacific Islanders ("AAPI") by providing linguistically accessible and culturally appropriate legal services to low-income residents in the metropolitan Washington D.C. area. The organization accomplishes its mission through a three-pronged approach of: (1) community legal education, (2) individual representation, and (3) systematic advocacy. APALRC partners with local, state, and federal

government, law enforcement, school districts, and other community organizations to ensure low-income Asian Americans can readily access government services and legal resources. APALRC was awarded $388,843.00 in grant funding during FY 2023 for its "Stop Anti-Asian Hate Campaign." Defendants unlawfully terminated this funding on April 22, 2025. APALRC is based in Washington, D.C.

12.     Defendant Pamela Bondi is the Attorney General of the United States and head of DOJ. She is ultimately responsible for the termination of the Anti-Hate Crimes Grant Program. She is sued in her official capacity.

13.     Defendant U.S. Department of Justice is a department of the Executive Branch of the United States government headquartered in Washington, D.C. It is the agency through which the Anti-Hate Crimes Grant Program is administered.

14.     Defendant Office of Justice Programs ("OJP") is the largest grant-making component agency of DOJ and distributes funding, research, and support to enhance the American justice system, including the Anti-Hate Crimes Grant Program.

15.     Defendant Bureau of Justice Assistance ("BJA") is a component of the OJP within DOJ. Defendant BJA is DOJ's leading criminal justice grant agency and distributes funding, training, and technical assistance to state and local governments to combat violent and drug-related crime and improve the criminal justice system, including administering funding for the Anti-Hate Crimes Grant Program.

16.     Defendant Maureen Henneberg is the Deputy Assistant Attorney General for Operations and Management and leads the Office of Justice Programs in an acting capacity. She is sued in her official capacity.

17.    Defendant Tammie Gregg is the Acting Director of the BJA. She is sued in her official capacity.

## LEGAL BACKGROUND

### A.    Under the U.S. Constitution, Congress—Not the Executive Branch—Controls Appropriations

18.    To ensure that Congress alone controls public spending, the Appropriations Clause of the Constitution forbids the expenditure of federal funds except "in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7.

19.    The separation of powers forbids the executive branch from amending or ignoring a law once duly enacted. *See Clinton v. City of New York*, 524 U.S. 417, 438 (1998).

20.    The Executive Branch does not have inherent Constitutional power to withhold funds that Congress has lawfully appropriated. Absent specific statutory authorization, the Executive has only the powers conferred to it by the Constitution *See* U.S. CONST. art. II, § 1, cl. 1; *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). The power to control federal spending, the "power of the purse," belongs to Congress, not the Executive.

21.    Two federal statutes specify this prohibition on withholding appropriated funds. First, the Impoundment Control Act of 1974 expressly prohibits the President from declining to obligate appropriated funds. Pub. L. No. 93-344, 88 Stat. 333 (codified as amended at 2 U.S.C. §§ 681 *et seq.*). It provides that all Congressionally appropriated funds "shall be made available for obligation" unless the President transmits a "special message" to Congress and Congress rescinds the appropriation. 2 U.S.C. § 683(b); *id.* § 684(a).

22.    Second, the Anti-Deficiency Act Amendments of 1982 forbid the Executive from declining to spend (and thus holding in reserve) appropriated funds for policy reasons. It also bars

the Executive from redirecting funds to purposes other than those prescribed by Congress. Pub. L. No. 97-258, 96 Stat. 877, 929 (codified as amended throughout Title 31). Under the Anti-Deficiency Act, "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). "In apportioning or reapportioning an appropriation, a reserve may be established only—(A) to provide for contingencies; (B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or (C) as specifically provided by law." *Id.* § 1512(c)(1).

23.    Congress created Defendants Office of Justice Programs and Bureau of Justice Assistance through the Justice Assistance Act of 1984. 34 U.S.C. §§ 10101, 10141. While the Justice Assistance Act of 1984 gives the Attorney General authority to make grants or enter into cooperative agreements for OJP and final authority over OJP's functions, it does *not* confer upon either the Attorney General or the BJA Director unilateral power to terminate grants distributed by OJP or BJA. *See* 34 U.S.C. §§ 10110, 10141(b).

24.    Starting in 2022, Congress appropriated funds to OJP "for grants, contracts, cooperative agreements, and other assistance" that were "to remain available until expended" specifically on grants supporting "community-based approaches to advancing justice and reconciliation, facilitating dialogue between all parties, building local capacity, de-escalating community tensions, and preventing hate crimes through conflict resolution and community empowerment and education[.]" Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 1242–27 (2022) (referred to herein as "FY22 Appropriations"); *see also*, Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4534–37 (2022) (referred to herein as "FY23 Appropriations"); Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 145 –49 (2024) (referred to herein as "FY24 Appropriations").

25.    In FY22 Appropriations, FY23 Appropriations, and FY24 Appropriations, Congress further instructed OJP to submit a spending plan to "specifically and explicitly identify all changes in the administration of competitive grant programs … including changes to applicant eligibility, priority areas or weightings, and the application review process." *Id.*

26.    Because Congress has forbidden the President to withhold or redirect duly appropriated funds based on his own policy priorities, the President's "power is at its lowest ebb" when he attempts to do so. *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring).

**B.    DOJ Must Administer Grants in Compliance with the Uniform Guidance**

27.    On December 26, 2014, DOJ adopted the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards as stated in 2 C.F.R. Part 200 ("the Uniform Guidance"). *See* 2 C.F.R. § 2800.101. These detailed regulations govern DOJ's administration of federal grant funding, including but not limited to, how grants are awarded, who may qualify for grants, how grant funds may be accessed, how grants are monitored, and specify the grounds on which such grants may be terminated.

28.    The Uniform Guidance requires an award-making agency to "manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with the U.S. Constitution, applicable Federal statutes and regulations." 2 C.F.R. § 200.300(a).

29.    In awarding grants, federal agencies must conduct risk assessments based on criteria that include an applicant's history of managing previous federal awards and their ability to effectively implement statutory, regulatory, or other requirements. 2 C.F.R. § 200.206.

30.    The Uniform Guidance does not confer unlimited discretion upon Defendant DOJ to terminate grants. Instead, the Uniform Guidance allows for termination only under specifically

elucidated circumstances and pursuant to specific procedures. The Uniform Guidance sets forth the four conditions under which either DOJ or the award recipient may terminate a federal award.

31.     *First*, a federal agency may terminate a federal award "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award." 2 C.F.R. § 200.340(a)(1).

32.     *Second*, a federal agency may terminate a federal award "with the consent of the recipient." *Id.* § 200.340(a)(2).

33.     *Third*, the *recipient* may terminate a federal award upon sending the federal agency "a written notification of the reasons for such termination, the effective date, and, in the case of partial termination, the portion to be terminated." *Id.* § 200.340(a)(3) (emphasis added).

34.     *Fourth*, the federal agency may terminate a federal award "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an *award* no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4) (emphasis added). Section 200.340(a)(4) does ***not*** permit DOJ to justify terminating a grant award based on a post-award "change" in agency priorities. Instead, DOJ can only terminate a grant award under this provision if it offers specific evidence establishing that the award no longer advances agency priorities or program goals *as set at the time the grant was awarded*.

## FACTUAL ALLEGATIONS

### A.     Congress Appropriates Funding to Support Community-Based Approaches to Stopping Hate Crimes

35.     Hate crimes are on the rise. They are also chronically underreported to and under-identified by law enforcement.[3] As Defendants have defined them, "[h]ate crimes [are] a crime

---

[3] *See e.g.,* BJA FY 23 Community-based Approaches to Prevent and Address Hate Crime, Opportunity Number O-BJA-2023-171643, at 7, https://bja.ojp.gov/sites/g/files/xyckuh186/files/media/document/O-BJA-2023-171643.pdf.

motivated by bias against race, color, religion, national origin, sexual orientation, gender, gender identity, or disability."[4] They have a "devastating effect beyond the harm inflicted on any one victim. They reverberate through families, communities, and the entire nation as others fear that they too may be threatened [or] attacked[.]"[5]

36.    Hate crimes continue to harm American communities. According to the most recent hate crime statistics available from the Federal Bureau of Investigation, from January 2023- December 2023, there were 12,498 hate crimes/bias incidents reported nationally.[6] Nearly three-quarters of those were hate crimes motivated by race/ethnicity/ancestry or sexual orientation/gender identity.[7]

37.    In response to high-profile hate crimes, which have victimized numerous communities around the country, Congress has passed key legislation in the last two decades. In 2009—in response to the anti-gay slaying of Matthew Shepherd and lynching of James Byrd Jr.— Congress passed the Matthew Shepard and James Byrd Jr. Hate Crimes Prevention Act, 18 USC § 249, to expand hate crime laws in the United States to include crimes motivated by a victim's actual or perceived gender, sexual orientation, gender identity, or disability.

38.    More recently, the COVID-19 Hate Crimes Act, Public Law 117-13, was signed into law on May 20, 2021, to address hate crimes particularly against the AAPI community, which had dramatically risen during the COVD-19 pandemic in part due to anti-Chinese racism. The COVID-19 Hate Crimes Act also included the Jabara-Heyer NO HATE Act—passed in response

---

[4] U.S. Dept. of Justice, Learn About Hate Crimes, https://www.justice.gov/hatecrimes/learn-about-hate-crimes.
[5] U.S. Dept. of Justice, Hate Crimes Prosecutions, https://www.justice.gov/crt/hate-crimes-prosecutions.
[6] FBI, Hate Crime in the United Sates Incident Analysis, https://cde.ucr.cjis.gov/LATEST/webapp/#/pages/explorer/crime/hate-crime.
[7] *Id.*

to the killings of Lebanese-American Khalid Jabara and Heather Heyer, who was killed by a white supremacist during the 2017 Charlottesville riot—which created grants for state and local governments to combat hate crimes.

39.     In response, Congress, *inter alia*, appropriated $5,000,000, $10,000,000 and $9,000,000 in the FY22 Appropriations, FY23 Appropriations, and FY24 Appropriations, respectively, for grants "to support community-based approaches to advancing justice and reconciliation, facilitating dialogue between all parties, building local capacity, de-escalating community tensions, and preventing hate crimes through conflict resolution and community empowerment and education." *See* The Consolidated Appropriations Act of 2022, Pub. L. No. 117-103, 136 Stat. 49, 127 (2022); The Consolidated Appropriations Act of 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4537 (2022); The Consolidated Appropriations Act of 2024, Pub. L. No. 118-42, 138 Stat. 25, 145, 149 (2024).

**B.    Plaintiffs Awarded Funding Pursuant to the Anti-Hate Crimes Grant Program**

40.     Since 2022, Defendants have solicited applications for the Anti-Hate Crimes Grant Program funded through the above-mentioned Congressional appropriations pursuant to Congressional instructions.

41.     In administering the Congressionally funded Anti-Hate Crime Grant Program, Defendant BJA stated that it sought to "support comprehensive community-based approaches to addressing hate crimes that promote community awareness and preparedness, increase victim reporting, and improve responses to hate crimes."[8] The Anti-Hate Crime Grant Program was

---

[8] Wayback Machine, Dept. of Justice, FY24 Community-based Approaches to Prevent and Address Hate Crime,
https://web.archive.org/web/20240502072939/https://bja.ojp.gov/funding/opportunities/o-bja-2024-172028.

designed to advance "community-informed models for preventing and responding to hate speech and incidents."[9] The BJA instructed Program applicants their approaches should be designed to "promote community awareness and preparedness, increase victim reporting, and improve responses to hate crimes."[10]

42.    The grants were aimed at community-based, national civil rights, and intermediary organizations, including nonprofit community-based organizations and civil rights organizations like Plaintiffs.[11]

43.    Since 2022, the Anti-Hate Crimes Grant Program has provided funding for three-year performance periods to its grantees. For fiscal year 2022, Defendants awarded eight grants under the Anti-Hate Crimes Grant Program, including to Plaintiff SAN. Grantees include community-based organizations ("CBOs") and civil rights organizations that are, *inter alia*, tribal, nonprofit, and academic institutions. These organizations are pillars of their communities and play a critical role in quelling fear, sharing information, and delivering services in culturally and linguistically accessible ways that improve safety for impacted individuals and communities.

44.    For fiscal year 2023, Defendants awarded 18 such grants, including to Plaintiffs APALRC and Right To Be.

45.    For FY 2024, BJA made 11 $400,000 grants available to community-based organization, including to Plaintiff SBSS.

---

[9] Grants.gov, View Grant Opportunity O-BJA-2024-172028, https://www.grants.gov/search-results-detail/352890.
[10] Bureau of Justice, FY 2024 Community-Based Approaches to Prevent and Address Hate Crime, https://bja.ojp.gov/funding/fy24-sol-overview-cbhc.pdf.
[11] *Id.*

46. All Anti-Hate Crimes Grant Program recipients are required to regularly submit performance data that show results in achieving the Anti-Hate Crimes Grant Program's goals and objectives as set forth in the grant funding solicitation issued by Defendants for each year.

47. All Anti-Hate Crimes Grant Program recipients may utilize funds for allowable costs and expenses only. As such, all Anti-Hate Crimes Grant Program recipients are required to submit federal financial reports ("FFR") on a quarterly basis. FFRs show the actual funds that have been spent and any bills that will be paid by Anti-Hate Crimes Grant Program recipients.[12]

48. Anti-Hate Crimes Grant Program recipients may draw down only necessary amounts from their award and must disburse them within ten days. All Plaintiffs receive their grant funds by making quarterly reimbursement requests for allowable expenses alongside their FFR.

### APALRC

49. APALRC was awarded $388,843.00 in grant funding during FY 2023 from OJP pursuant to a grant award, 15PBJA-23-GG-04171-ADV. APALRC accepted the grant on October 2, 2023. APALRC relied on the grant award to support APALRC's "Stop Anti-Asian Hate Campaign," which aimed at addressing the rise in hate crimes and bias incidents against the metropolitan D.C. area's AAPI community since 2020, and the underreporting of these crimes/incidents. The campaign sought to achieve four outcomes: (1) educate the API community in identifying, preventing, and responding to anti-Asian hate crimes/bias incidents; (2) enhance APALRC's organizational capacity to provide language accessible legal services and resources to victims of anti-Asian hate crimes/bias incidents; (3) increase reporting of anti-Asian hate

---

[12] Dept. of Justice, DOJ Grants Financial Guide (Oct. 2024), at 111, https://www.ojp.gov/doj-financial-guide-2024.

crimes/bias incidents; and (4) collaborate with law enforcement, legal and social service providers, and mental health providers to reduce the frequency and impact anti-Asian hate.

50.    Receiving the grant award allowed APALRC to continue retaining a staff attorney charged with running the campaign. This staff attorney conducted community legal education "Know Your Rights" seminars to teach attendees how to identify anti-Asian hate, how to respond to anti-Asian hate as a victim and/or bystander, and how to report anti-Asian hate crimes/incidents. She also sat on multiple task forces with government officials at the local and state levels to discuss how to identify and combat anti-Asian hate.

51.    APALRC planned to use the grant to establish a language accessible hotline to report anti-Asian hate crimes/incidents and to partner with other community-based organizations, both legal and non-legal, to increase awareness of anti-Asian hate and the connection between anti-Asian hate and other criminal/bias activity, such as human trafficking and race-based bullying.

52.    From July 1, 2024 through April 22, 2025, APALRC conducted 19 "Know Your Rights" presentations, providing approximately 561 community members with information on hate/bias incidents, human trafficking, bystander intervention training, and resources for victims of hate crimes. APALRC partnered with local, state, and federal officials to present these seminars. APALRC ultimately assisted eleven community members with legal issues stemming from anti-Asian hate.

**_Right To Be_**

53.    Right To Be was awarded $400,000 in grant funding during FY 2023 from OJP pursuant to a grant award, 15PBJA-23-GG-04164-ADVA. Right To Be accepted the grant in September 2023. Right To Be relied on the grant award to develop and support a program called "Bystander Intervention to Prevent and De-escalate Hate-Based Violence Against LGBTQ+

Community Members in Texas." Partnering with the Pride Center San Antonio and using the awarded funding, Right To Be also planned to scale bystander intervention trainings to prevent and de-escalate hate crimes/incidents against the LGBTQ+ community in Texas. The program aimed to train 7,000 people in Texas by the end of the program's third year. Right To Be administers the program from Brooklyn and submits reimbursements, performance reports, and FFRs from Brooklyn.

### South Asian Network

54.    SAN was awarded $400,000 in grant funding during FY 2022 from OJP pursuant to a grant award, 15PBJA-22-GG-04857-ADVA. SAN was awarded and accepted the grant on September 2022. SAN relied on the grant award to fund its "Stop The Hate Project," which aimed to enhance anti-Asian hate crime awareness among South Asians and provide resources to assist victims of anti-Asian hate crimes, including case management services, mental health therapy, and bystander intervention training to the South Asian community in Los Angeles at large. This project provided for hate crime and hate incident data collection, raising awareness of hate crimes and incidents, educating low-income, limited-English proficient community members about hate crime reporting and prevention, and mental health therapy for victims of such crimes. Through this project and using award funding, SAN leveraged community partnerships to engage in outreach to approximately 15,000 people, including in hard-to-reach populations such as seniors and individuals with limited English proficiency.

55.    SAN funded two full-time staff members' work on this project through the grant: one extremely well-connected community organizer, and a community outreach coordinator with over a decade of experience. Before the dismantling and defunding of the Anti-Hate Crimes Grant Program, SAN served approximately 600 community members through Know Your Rights

community workshops and listening sessions, conducted 25 mental health sessions, and reached over 15,000 people through mass outreach.

### St. Barnabas Senior Services

56.     SBSS was awarded $400,000 in grant funding during FY 2024 from OJP pursuant to a grant award, 15PBJA-24-GG-02837-ADVA. SBSS accepted the grant on November 19, 2024. SBSS's grant award supported a project titled "Community-Based Approach to Hate Crimes Targeting the Older Adult Population in Los Angeles," which aimed to reach, educate, and empower older adults to advocate for themselves in response to the rise in hate crimes targeting this demographic. The grant award constituted 100% of the funding for this project. Relying on grant funding, SBSS aimed to further develop and train an advocacy group called "AGEnts for Change" to foster older adults' interactions with city officials on policies impacting them, launch an educational, anti-hate media campaign on YouTube in partnership with numerous other community-based organizations, and grow a coalition with city, state, and federal law enforcement to help facilitate interactions with older adults, including hate crime response and reporting. The grant funded 75% of its AGEnts for Change advocacy program and 100% of two other initiatives: a media campaign and a coalition with law enforcement at the city, state, and federal levels. To accomplish these goals, SBSS hired a Public Affairs Director and was also using the award to fund its Director of Communication and Senior Director of Communication roles. Specifically, SBSS's grant award was going to fund 50% of the Public Affairs Director's salary, 50% of the Director of Communications' salary, and 25% of the Senior Director of Communications' salary.

### C.     Defendants Abruptly Defund the Anti-Hate Crime Grants Program

57.     On April 22, 2025, before the conclusion of the performance period of any grant, Defendants abruptly and without prior notice defunded the Anti-Hate Crimes Grant Program by terminating, *en masse*, all grants awarded under it, including those awarded to Plaintiffs.

58.     These grant terminations were a part of a wide-scale blunderbuss cancelation of hundreds of grants worth millions of dollars to nearly 400 community organizations and local governments by DOJ.

59.     On April 23, 2025, Defendant Bondi boasted about the mass grant terminations on X, calling services to affected populations "wasteful": [13]



60.     DOJ's blanket terminations are also the subject of a House Judiciary Committee probe. The House Committee on the Judiciary wrote Defendant Bondi on May 5, 2025, describing

---

[13] Attorney General Pamela Bondi (@AGPamBondi), X (Apr. 23, 2025 4:21 PM) https://x.com/AGPamBondi/status/1915184169069818356

the grant terminations as "baffling." [14] The letter further noted that "[t]he Department's notifications to grantees not only fail to provide awardees with any explanation as to why their awards conflict with or do not serve the DOJ's priorities, but also do not provide any details as to how these termination decisions were made."[15] Legislators described the terminations as "chaotic" and expressed strong concern for "the risk of harm this will cause to our communities."[16]

61.    Underscoring the problematic and widespread nature of the OJP grant terminations, on April 22, 2025, each Plaintiff received virtually identical termination notices from OJP, which differed only in the recipient and the individual award number. *See* Ex. 1 (the "Termination Notices"). These Termination Notices were the first notice Plaintiffs received of any threat to their funding. Upon information and belief, such identical Termination Notices were emailed to ***all*** or nearly all grantees of the Anti-Hate Crimes Grant Program.

62.    The Termination Notices informed each award recipient that their "award is being terminated because it 'no longer effectuates the program goals or agency priorities.'" 2 C.F.R. § 200.340(a)(4). Ex. 1. The Termination Notices terminated "[a]ll unobligated balances remaining" and stated that "the use of award funds will not be allowed for obligations incurred, or expenditures made, after receipt of this notice, other than pursuant to closeout responsibilities." *Id.*

63.    Beyond a mere boilerplate explanation that "[t]he Department has changed its priorities with respect to discretionary grant funding to focus on, among other things, more directly supporting certain law enforcement operations, combatting violent crime, protecting American

---

[14] Letter from House of Representatives Committee on the Judiciary to Attorney General Bondi (May 5, 2025), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2025-05-05.hjc_dems_to_bondi_doj_re_ojp_grant_terminations.pdf.
[15] *Id.*
[16] *Id.*

children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of government," the Termination Notices offered no rationale, individualized or otherwise, for why it had decided to terminate each recipient's grant. *Id.*

64.    The Termination Notices informed grantees that "[c]onsistent with 2 C.F.R. § 200.342," they "may appeal this termination in writing within 30 calendar days of the date of this notice" to seek a waiver of the termination. *Id.* The Termination Notices set forth no timeline for agency response. *See id.*

65.    The Termination Notices also obliged grant recipients to commence "closeout and other obligations in 2 C.F.R. § 200.340(d)" and to "promptly refund any unobligated funds" and retain grant records for at least three years. *Id.* In closing, the Termination Notices informed grant recipients that failure to meet these closeout obligations could result in "appropriate enforcement actions," and "affect eligibility for future grants." *Id.*

66.    Plaintiffs have no further information to understand how their award activities conflict with DOJ's newly stated "priorities." APALRC's funded project, for example, focuses in part on combating sex-trafficking in their community, a priority seemingly in keeping with one OJP identified in its Termination Notice. *See id.*

67.    And even Defendants seem hard-pressed to explain why the Program conflicts with program goals or agency priorities. Indeed, when asked why she defunded the three largest sources of DOJ funding for hate crime prevention programs, including Anti-Hate Crimes Grant Program,

at a recent U.S. House of Representative committee hearing, Defendant Bondi testified under oath that she was not familiar with this Program.[17]

68.     Just two days later, Defendant Bondi testified that, "I will never let a grant be cut if it's hurting women, victims of sexual assault, children, law enforcement officers. So we will look at those, each grant individually to see what is fluff, what is DEI – no longer at the Department of Justice – and what are viable grants, and those – that money will go where it should go: to protect victims of crime and our law enforcement officers."[18] But instead of looking at each grant individually, Defendants have defunded the Anti-Hate Crimes Grant Program through *en masse*, *pro forma* terminations.

69.     Despite their confusion and a dearth of information, all Plaintiffs submitted administrative appeals to OJP challenging the grant termination to the best of their ability by May 22, 2025.

70.     On May 21, 2025, Plaintiff APALRC submitted its appeal. OJP confirmed receipt of the appeal on May 27, 2025. As of this filing, APALRC has not received any further communication about the status of its appeal, including a timeline for or whether a final determination has been made.

71.     On May 20, 2025, Plaintiff Right To Be submitted its appeal. Other than confirmation of receipt by OJP, as of this filing, Right To Be has not received any further

---

[17] House Appropriations Committee, *Budget Hearing – Fiscal Year 2026 Request for the Department of Justice*, YouTube (June 23, 2025), https://youtu.be/zHnbhc_oePA.
[18] U.S. Senate Committee on Appropriations, Subcommittee Hearing: A Review of the President's Fiscal Year 2026 Budget Request for the Department of Justice (June 25, 2025), https://www.appropriations.senate.gov/hearings/a-review-of-the-presidents-fiscal-year-2026-budget-request-for-the-department-of-justice.

communication about the status of its appeal, including a timeline for or whether a final determination has been made.

72.    On May 20, 2025, Plaintiff SAN submitted its appeal. Other than confirmation of receipt by OJP, as of this filing, SAN has not received any further communication about the status of its appeal, including a timeline for or whether a final determination has been made.

73.    On May 21, 2025, Plaintiff SBSS submitted its appeal. Other than confirmation of receipt by OJP, as of this filing, SBSS has not received any further communication about the status of its appeal, including a timeline for or whether a final determination has been made.

**D.    Plaintiffs Have Suffered Irreparable Harm Due to the Termination of the Anti-Hate Crimes Grant Program**

74.    All Plaintiffs have appealed the termination of their grant award and, where applicable, submitted a request for all allowable costs and outstanding reimbursements.

75.    But the defunding and dismantling of the Anti-Hate Crimes Grant Program has harmed and will continue to irreparably harm each Plaintiff.

76.    Defendants informed all Plaintiffs that their "award is being terminated because it 'no longer effectuates the program goals or agency priorities.'" *See* Ex. 1. This will, at minimum, impede each Plaintiff's competitiveness for future grants pursuant to 2 C.F.R. § 200.206, which requires federal agencies to conduct risk assessments based on criteria that include an applicant's history of managing previous federal awards and their ability to effectively implement statutory, regulatory, or other requirements.

77.    Plaintiffs face the threat that the funding for their respective awards will be imminently re-obligated by DOJ, who will disburse the grant funding to "directly supporting law

enforcement" as Defendant DOJ told one senator, and that it "is committed to swiftly closing out the balance of the terminated grants and reallocating available funds through new grants."[19]

**APALRC**

78.     APALRC funded 90 to 95% of the "Stop Anti-Asian Hate Campaign" through the unlawfully terminated grant. Simply put, if the Program is not restored, APALRC will be forced to shut down its entire "Stop Anti-Asian Hate Campaign."

79.     Dismantling and defunding the Program will also force APALRC to lay off the sole staff attorney working on the "Stop Anti-Asian Hate Campaign." This staff attorney spent two years building trust in the AAPI community and cultivating relationships with other community-based organizations, law enforcement, and local, state, and government officials. Not only did this staff attorney lead "Know Your Rights" presentations, but she also sat on local, state, and federal task forces where she provided an invaluable voice about how anti-Asian hate manifests in American life. Without this staff attorney's expertise, connections, and platform, APALRC will lose all inroads gained with these individuals over the last two years.

80.     Prior to the dismantling and defunding of the Anti-Hate Crimes Grant Program, APALRC had made progress on the campaign's goal of providing accessible resources in local languages by drafting a trifold which contained resources about responding to anti-Asian hate. APALRC planned to translate the trifold into local languages and distribute it to the AAPI community. However, when Defendants dismantled and defunded the Program through the *en masse* grant terminations, APALRC stopped all work on the trifold.

---

[19] *See* Letter from U.S. Dept. of Justice, Office of Legislative Affairs to Sen. Charles E. Grassley, Committee on the Judiciary (May 9, 2025), https://www.grassley.senate.gov/imo/media/doc/doj_to_grassley_-_grants.pdf.

81. Additionally, when Defendants dismantled and defunded the Program through the *en masse* grant terminations, APALRC could no longer fund a vacant communications/data analyst position. This individual would have monitored a dedicated "Stop Anti-Asian Hate Campaign" hotline, created social medial content for the campaign, and conducted outreach efforts.

82. Stakeholders have already felt the impact of the dismantling and defunding of the Anti-Hate Crimes Grant Program. Because it lacks sufficient funding, APALRC can no longer schedule "Know Your Rights" presentations in Maryland and Virginia, meaning it can no longer partner with local, state, and nonprofits there. The "Know Your Rights" presentations provide important resources about reporting incidents of anti-Asian hate. For example, after parents of a Maryland student who experienced anti-Asian bullying at the student's school attended a "Know Your Rights" presentation, the parents sought APALRC's help to successfully obtain a school transfer. Without grant funds, APALRC cannot provide educational resources or legal services to victims of anti-Asian hate, as it did for this Maryland family.

83. Additionally, around a month before Defendants dismantled and defunded the Anti-Hate Crimes Grant Program, APALRC had been partnering with DOJ to present two "Know Your Rights" seminars to Asian America seniors in Washington, D.C. DOJ never expressed any negative feedback on those presentations, yet on March 3, 2025, the DOJ grant manager tasked to supervise this grant informed APALCR that DOJ would no longer participate in these trainings due to "recent Executive Orders." APALRC cannot fulfill its mission to provide educational and legal resources to the API community if it cannot work with crucial partners, like DOJ.

84. APALRC currently has $345,475.22 left on its grant that will no longer fund these important projects.

*Right To Be*

85.    As a direct result of the dismantling and defunding of the Anti-Hate Crimes Grant Program, Right To Be and its subgrantee and, Pride Center San Antonio, have been forced to halt all work on the trainings. Using the grant funds, Right To Be planned to significantly expand the trainings funded by this grant in Texas utilizing its "train the trainer" model. Right To Be and its subgrantee had begun the process of identifying and working with five to ten additional Texas-based organizations to scale this program statewide.

86.    Without the grant money, Right To Be can no longer conduct this initiative in Texas at all. The grant constituted 100% of Right to Be's funding for this project. Plaintiff Right To Be's "Bystander Intervention to Prevent and De-escalate Hate-Based Violence Against LGBTQ+ Community Members in Texas" initiative is one of a limited set of programs designed to prevent and de-escalate LGBTQIA+ hate incidents in Texas. If Right To Be attempted to proceed with the initiative, it would face a significant budget shortfall. Furthermore, Right To Be cannot cover the cost of the initiative via other funding sources.

87.    The dismantling and defunding of the Anti-Hate Crimes Grant Program ended Right To Be's collaboration on this project with Pride Center San Antonio. Even if the Anti-Hate Crimes Grant Program is reinstated, Pride Center San Antonio may no longer be able to resume its work with Right To Be because they may lose qualified staff as a result of the dismantling and defunding of the Program.

88.    As a direct result of the dismantling and defunding of the Anti-Hate Crimes Grant Program and the concomitant forced termination of its Texas anti-hate intervention training program, Right To Be has suffered significant adverse effects on its reputation among current and potential partners in Texas. Former and future trainees will not rely on Right To Be's resources as a result of the cancelled trainings. While Right To Be has been trying to partner with Texas

universities and colleges, those institutions are now worried about partnering with Right To Be since the dismantling and defunding of the Anti-Hate Crimes Grant Program, believing it to be economically at-risk, unable to fulfill externally funded projects, "on the wrong side of the government's priorities," and subject to government retaliation.

89.     As a direct result of the dismantling and defunding of the Anti-Hate Crimes Grant Program, Right To Be has been unable to find partners to apply for other federal grants such as DOJ's Office on Violence Against Women "Reduce Domestic Violence, Dating Violence, Sexual Assault, and Stalking on Campus Program." Prospective partners are aware of Right To Be's grant termination and are afraid that by partnering with them they will not be awarded a grant.

90.     After submitting its most recent reimbursement request, Right To Be has about $386,455.00 remaining on its grant for mission-fulfilling services, like creating trainings to combat anti-LGBTQIA+ hate in Texas, that it planned through 2026.

### South Asian Network

91.     The terminated grant was 100% of the Stop The Hate project's budget. SAN has been forced to eliminate that program because of the Termination Notice. Through its interactions with community members, peer organizations, and funders post-termination, SAN has noticed that because of fear and hesitation about SAN's future and the opaqueness surrounding their grant termination, it is unlikely that other funders will be willing to fill this gap. SAN has received only about 50% of its usual individual and community donations since the dismantling of the Program. This reputational and financial hit prevents SAN from being able to respond to the current threats facing South Asian immigrants in Los Angeles, which hinders its organizational mission.

92.     As a direct result of the dismantling and defunding of the Anti-Hate Crimes Grant Program, SAN was forced to reassign—only to eventually lose—the two critical staff members that were funded by the grant. In doing so, SAN had to use their limited unrestricted general

25

support funds. These are individuals whose connections in the South Asian community have been a massive boost for SAN's work and ability to carry out its mission with religious houses of worship specifically in the city of Artesia, California. By being forced to utilize their unrestricted general support funds, SAN faces additional irreparable harm because even if the Program is restored, SAN will not recoup this expenditure because grant funds can only be used for limited purposes and for grant-related activities. Moreover, because of the grant termination, SAN cannot use these same unrestricted general support funds for other fundraising events as it could have otherwise done.

93.     The South Asian community served by SAN now faces the prospect of persistently low levels of awareness and reporting of hate crimes and barriers accessing resources due to language limitations and low income. After establishing trust within the underserved South Asian community facing high rates of hate crimes and incidents for over 30 years, community members are noticing and experiencing the distinct absence of SAN's services at a time when the need for assistance has skyrocketed. SAN is rapidly losing the trust of their client community as a direct result of the dismantling and defunding of the Anti-Hate Crimes Grant Program.

94.     SAN is also forced to answer questions by peer organizations, community leaders, and faith leaders about the disruption in the services provided through their Stop the Hate project at time when it is most needed. SAN is forced to disclose the termination of its grant to protect its own reputation and now must contend with the loss of confidence by peer organizations, community leaders, and faith leaders as a direct result of the dismantling and defunding of the Anti-Hate Crimes Grant Program. At least one peer organization has refused to continue longstanding work with SAN, an abrupt change in their relationship since Defendants' dismantling.

95.     After submitting for final costs and reimbursements, SAN has $240,618.28 remaining in its grant award. Before the termination, SAN intended to submit a routine extension request for their grant because of initial delays caused by a new budget in 2022. This would have allowed SAN to use the full amount of their grant to continue providing the Stop the Hate Project's crucial services.

*St. Barnabas Senior Services*

96.     As a result of the grant termination, SBSS has lost or will soon lose key staffers and has or will soon have to dramatically slash its programming.

97.     The Public Affairs Director was meant to engage in outreach to older adults as part of AGEnts for Change and establish critical connections with older, diverse adults in the Greater Los Angeles area. This role was also going to build SBSS's coalition with law enforcement, help organize events such as panels and town halls, and put together a working group to explore issues associated with older adults and hate crimes. But just weeks after hiring its Public Affairs Director, SBSS learned that OJP had terminated their grant award as part of the dismantling and defunding of the Anti-Hate Crimes Grant Program. SBSS's new Public Affairs Director resigned shortly thereafter. Had the Public Affairs Director not resigned, SBSS very likely would have had to terminate this position. Because losing the grant means that SBSS no longer has the funding it needs to support the role, SBSS will be unable to refill this position.

98.     The Director of Communications was meant to lead SBSS's anti-hate media campaign in partnership with multiple community-based organizations and media outlets with the goal of promoting hate crime reporting. Additionally, this role was going to oversee converting campaign content into other languages such as Korean, Mandarin, Hindi, and Spanish, increasing SBSS's reach to non-English speaking seniors. SBSS's Director of Communications was already in talks with multiple media partners and preparing to enter into promotional and airtime

agreements. However, after losing its award—which comprised 50% of the Communications Department's budget—the Director of Communications had to inform these community media outlets that SBSS could no longer partner with them. Currently, SBSS only has enough money to pay its Director of Communications through December 2025.

99.    The Senior Director of Communications was going to work with SBSS's Director of Communications on outreach to community-based organizations and media outlets as well as developing strategies for audience engagement. SBSS's prior Senior Director of Communications resigned in March. As a direct result of the dismantling and defunding of the Anti-Hate Crimes Grant Program, SBSS will also be unable to refill this position.

100.    Losing funding for multiple positions has created a devastating ripple effect, forcing SBSS to redirect other sources of funding across the organization and thereby impacting other important roles and SBSS's ability to carry out its organizational mission. For example, SBSS was recently forced to terminate three staff members: a technology educator (who taught SBSS's technology education program), a disaster preparedness instructor (who taught older adults throughout the community), and an executive assistant. SBSS will also be cutting the salaries of three top executives (its President/CEO, its Vice President of Programs, and its Director of Government Relations) and has frozen all hiring across the organization.

101.    Due to this hiring freeze, SBSS has had to pause plans to search for and hire a new CFO and other positions key to SBSS's success, stretching coverage between existing executives and staff members. Without a CFO, SBSS is facing reduced support and overall guidance on accounting and budgeting, and other executives have had to take on the CFO's responsibilities. SBSS also had plans to backfill an important site director position at one of its three senior centers.

Now, staff members at its two other sites will have to cover and co-supervise the third site, which SBSS predicts may affect their responsiveness to the needs of their older adults.

102.    As one of its bedrock services, SBSS provides hot meals to older adults at multiple community meal sites throughout Los Angeles County. Due to the staffing shortages caused by the loss of grant funds, SBSS anticipates that it may need to close one or two of these meal sites. The meals provided by SBSS are sometimes the only meal their clients—who largely live alone, do not have a support system, depend on social security, and speak minimal English—receive per day, cutting off a vital, life-sustaining resource to a vulnerable population.

103.    Reputationally, SBSS has also lost the trust it has spent decades fostering with the community, with some older adults deciding to stop visiting their meal sites and questioning whether they can continue to rely on SBSS's services given the recent cuts. SBSS has already received feedback from older adults that they have noticed a decline in services and are fearful that SBSS will permanently shutter.

104.    Programmatically, losing 75% of the budget for AGEnts for Change has drastically reduced the initiative from proactively teaching advocacy skills to a demographic that has been the target of rising hate crimes to becoming a largely reactionary program. Instead of teaching older adults how to engage with politicians and empowering them through learning about policy, AGEnts for Change's services have been slashed to only being able to show older adults how to write letters and make public comments. SBSS had even lined up meetings with local politicians, including Representative Sydney Kamlager-Dove and Los Angeles City Councilmember Hugo Soto Martinez; both meetings have had to be postponed.

105.    Before Defendants dismantled and defunded the Anti-Hate Crimes Grant Program, AGEnts for Change had trained older adults to make meaningful changes in their communities in

a variety of ways. As one example, AGEnts for Change helped older adults advocate for the installation of a working elevator at a low-income apartment building in Los Angeles's Chinatown, enabling them to have better access to necessary services such as meal deliveries. The program had also recently helped advocate for maintaining Medicaid funding, which many participants are dependent on, and had set up a phone bank for older adults to contact their local representatives. AGEnts for Change also trained and motivated one older adult, Martha, to advocate in person in April in front of the Los Angeles City Council, testifying about the importance of maintaining funding for essential Los Angeles Department of Aging programs such as English and computer classes. Martha stated that learning about advocacy and coming to SBSS had changed her life and empowered her to speak out. Without the award, SBSS is largely unable to provide the same advocacy training to older adults like Martha. And since the award termination, SBSS has received feedback that participants of AGEnts for Change now feel "hopeless" overall.

106.    AGEnts for Change also had plans to host multiple workshops for older adults on advocacy and leadership. Prior to losing its award, the program had hosted just one workshop so far on how to recognize and report hate crimes and signs of elder abuse. These workshops and SBSS's outreach to the community can be lifechanging. For example, SBSS previously coordinated legal services for a client who was being taken advantage of by her son's friends after her son passed away. The son's friends were pressuring the client, who spoke only Korean, into signing over her house deed and were also stealing her belongings before SBSS intervened. Now, absent the award, SBSS can no longer host the same types of workshops and conduct community outreach to older adults in need.

107.    Because the grant funded 100% of SBSS's educational, anti-hate media campaign, defendants' dismantling of the Programs has derailed SBSS's plans to generate quarterly videos

promoting hate crime awareness, prevention, and intervention and partner with community media outlets to promote this content Now, at most, SBSS may be able to create one or two videos. SBSS had also been working with other local organizations, such as We Are LA and LA vs. Hate, to plan town hall meetings and amplify the message of promoting hate crime reporting; SBSS's ability to host any town halls is now uncertain.

108.     Similarly, because the Anti-Hate Crimes Grant Program was going to fund 100% of SBSS's initiative to build a coalition with law enforcement and help facilitate interactions with older adults, SBSS is losing those relationships SBSS had already begun establishing with law enforcement. It had also planned to invite officials to future town halls to discuss topics such as hate crime intervention and prevention strategies. Now, lacking key staff members such as its Public Affairs Director, SBSS is no longer able to build on or even maintain the valuable relationships and inroads it had spent significant time and energy forging. SBSS's older adults will now lose valuable opportunities to connect with, learn from, and build trust with law enforcement, which may unfortunately impact their safety and willingness to report hate crimes moving forward.

109.     As of the termination, SBSS had $360,000.00 remaining on its grant program that will no longer go towards these critical services for its older adults.

## CAUSES OF ACTION

### COUNT I
### Violation of the Separation of Powers Doctrine

110.     Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

111.     Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions, including actions that violate the Separation of Powers Doctrine.

112.    The Constitution vests exclusive power over federal spending with Congress. U.S. CONST. art. I, § 8, cl. 1 (Spending Clause). The Constitution explicitly denies that power to the other branches via the Appropriations Clause, which forbids the expenditure of federal funds except "in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7 (Appropriations Clause).

113.    Under Article II, the President must take care to faithfully execute the laws, including appropriations acts. U.S. CONST art. II, § 3. Consistent with the constitutional division of legislative and executive powers and the requirements of bicameralism and presentment, the Executive Branch has no unilateral authority to amend or ignore congressional appropriations. Nor may the Executive direct federal officers or agencies to act contrary to a federal statute.

114.    The Executive Branch also lacks inherent constitutional power to decline to spend funds that Congress has appropriated. Although the Executive would lack that power even in the absence of any statutory prohibition, both the Impoundment Control Act and Anti-Deficiency Act forbid the executive branch from unilaterally declining to spend appropriated funds, foreclosing any claim of concurrent executive power. 2 U.S.C. §§ 681 *et seq.*; 31 U.S.C. § 1301(a).

115.    Further, the Executive cannot decline to spend Congressionally appropriated funds based on a change of policy priorities. *See, e.g.*, *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) ("[a] President sometimes has policy reasons . . . for wanting to spend less than the full amount appropriated by Congress for a particular project or program. But in those circumstances, even the President does not have unilateral authority to refuse to spend the funds"); *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals").

116.    For the last three years, Congress has exercised its Article I legislative authority to appropriate funds to the Anti-Hate Crimes Grant Program, commanding Defendants to expend grant funds toward supporting community-based projects addressing hate crimes.

117.    Defendants now defy Congress. By unilaterally dismantling the Anti-Hate Crimes Grant Program and therefore refusing to spend funding that Congress had already appropriated for that purpose, Defendants have commandeered power constitutionally vested in Congress and exceeded their authority. Specifically, Defendants' actions override direct Congressional mandates, including:

> a.    The Consolidated Appropriations Act, 2022, which appropriated $5,000,000 in grants supporting "community-based approaches to advancing justice and reconciliation, facilitating dialogue between all parties, building local capacity, de-escalating community tensions, and preventing hate crimes through conflict resolution and community empowerment and education," which was "to remain available until expended. . . ." Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 124–27 (2022);
>
> b.    The Consolidated Appropriations Act, 2023, which appropriated $10,000,000 in grants for the same purpose to "remain available until expended. . . ." Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4534–37 (2022); and
>
> c.    The Consolidated Appropriations Act, 2024, which appropriated $9,000,000 in grants for the same purpose "to remain available until expended. . . ." Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 145–49 (2024).

118.    Defendants have engaged in an unconstitutional abuse of executive authority to override Congressional appropriations, usurping responsibilities vested in Congress in violation of the Separation of Powers Doctrine.

119.    For the foregoing reasons, Plaintiffs are entitled to declaratory and injunctive relief.

**COUNT II**
**Violation of the Administrative Procedure Act, Contrary to Law,**
**5 U.S.C. § 706(2)(A), (B), (C)**

120.    Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

121.    Agencies "are creatures of statute" and are therefore subject to the limits prescribed by Congress. *Nat'l Fed'n of Indep. Bus. v. Dep't of Labor, Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022) (per curiam). If an agency exceeds those limits, the court must vacate and set aside its action under the APA. *See* 5 U.S.C. § 706(2)(C).

122.    An agency is "bound by its own regulations," *Nat'l Env't Dev. Ass'ns Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (citation omitted), and an agency's failure to follow them is "contrary to the law," *Fuller v. Winter*, 538 F. Supp. 2d 179, 191 (D.D.C. 2008).

123.    Defendants' dismantling and defunding of the Anti-Hate Crimes Grant Program through the *en masse* termination of grant awards, including Plaintiffs', is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

124.    For the last three years, Congress has exercised its Article I legislative authority to appropriate funds to the Anti-Hate Crimes Grant Program through FY22 Appropriations, FY23 Appropriations, and FY24 Appropriations, commanding Defendants to expend grant funds toward supporting community-based projects addressing hate crimes.

125.    Congress did not afford Defendants discretion on this, as FY22 Appropriations, FY23 Appropriations, and FY24 Appropriations all required Defendants to keep "available until expended" funds explicitly for the Anti-Hate Crimes Grant Program. *See* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 124–28 (2022); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4534–37 (2022); and Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 145–49 (2024). Further, Congress mandated that Defendant OJP submit a spending plan that "specifically and explicitly identif[ies] all changes in the administration of competitive grant programs … including changes to applicant eligibility, priority areas or weightings, and the application review process." *Id.*

126.    By unilaterally dismantling and defunding the Anti-Hate Crimes Grant Program and therefore refusing to spend funding that Congress had already appropriated for that purpose, Defendants have usurped Congress' constitutional rights and powers and exceeded their statutory authority. *See* 5 U.S.C. § 706(2)(B) and (C).

127.    Defendants' stated authority and basis for dismantling and defunding of the Anti-Hate Crimes Grant Program through the *en masse* termination of grant awards is because the awards, including Plaintiffs', "no longer effectuate[ ] the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). In the Termination Notices, OJP claimed that the "Department has changed its priorities" and that "these awards demonstrate that they no longer effectuate Department priorities."

128.    OJP's *en masse* terminations are contrary to Section 200.340(a)(4) because a termination must be on an award-by-award basis, and OJP must rely on "specific evidence" to demonstrate that "an award" no longer serves a program goal or agency priorities. OJP's terminations were predicated on a change in agency priorities, but Section 200.340(a)(4) does not allow OJP to terminate based on a "change" to an agency's priorities that is entirely unconnected to the efficacy of a specific award. Moreover, OJP did not provide or rely on specific evidence that Plaintiffs' awards no longer effectuated any of the goals and priorities that motivated the award in the first place or any of the "new" goals and priorities.

129.    Because Section 200.340(a)(4) does not authorize OJP's terminations of Plaintiffs' grants, those terminations are not in accordance with the agency's adopted regulations or "in accordance with law," 5 U.S.C. § 706(2)(A).

130.    Defendants' dismantling and defunding of the Anti-Hate Crimes Grant Program must be declared unlawful as it exceeds statutory authority and is a violation of the Constitution.

131.    OJP's terminations on the basis of Section 200.340(a)(4) must be declared unlawful, including its interpretation that 2 C.F.R. § 200.340(a)(4) allows OJP to terminate a grant based on a "change" in agency priorities.

132.    Defendants' dismantling and defunding of the Anti-Hate Crimes Grant Program through the *en masse* terminations must be vacated and "set aside" under 5 U.S.C. § 706(2)(A), (B), & (C).

133.    Plaintiffs request that this Court enter preliminary and permanent injunctive relief enjoining Defendants' dismantling and defunding of the Anti-Hate Crimes Grant Program, including the *en masse* termination of grants on the basis of a "change" in agency priorities.

## COUNT III
## Violation of the Administrative Procedure Act, Arbitrary and Capricious, 5 U.S.C. § 706(2)(A)

134.    Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

135.    Defendants' dismantling and defunding of the Anti-Hate Crimes Grant Program is a final agency action reviewable under 5 U.S.C. §§ 702 and 706.

136.    Under the APA, the Court shall "hold unlawful and set aside agency action" that is "arbitrary [and] capricious." 5 U.S.C. § 706(2)(A). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

137.    The APA requires an agency to "examine the relevant data and articulate a satisfactory explanation for its action including 'a rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence

before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. Agency action must be "upheld, if at all, on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962).

138.    Defendants' actions are arbitrary and capricious because they have failed to adequately justify their actions; consider reasonable alternatives; consider key aspects of the problem, including substantial reliance interests at stake; and justify their change of position.

139.    Defendants have not provided a rational and reasoned basis for dismantling and defunding the Anti-Hate Crimes Grant Program. Each Termination Notice contains the same, boilerplate reasons for termination: that the awards "no longer effectuate the program goal or agency priorities." They further state "the Department has changed its priorities to focus on certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts." The Terminations Notices provided no individualized evaluation of the grants nor explain with specificity why the individual grants no longer advanced DOJ's "changed" priorities.

140.    Considering Plaintiffs' use the grants to address hate crimes, increase victim reporting, coordinate with local law enforcement, educate communities about human trafficking, improve responses to hate crimes, and provide bystander intervention trainings, Defendants have failed to justify why their change in position supports the dismantling and defunding the Anti-Hate Crimes Grant Program through the *en masse* termination of the grants, including Plaintiffs'.

141.    Defendants failed to consider the substantial reliance interests of Plaintiffs and other stakeholders, including the populations they serve.

142.    Defendants' arbitrary and capricious *en masse* terminations of grants, including Plaintiffs', awarded under the Anti-Hate Crimes Grant Program constitute an "abuse of discretion" under the APA.

143.    As a result of Defendants' arbitrary and capricious actions and abuse of discretion, Plaintiffs have suffered and will continue to suffer irreparable injury.

144.    Defendants' dismantling and defunding of the Anti-Hate Crimes Grant Program through the *en masse* terminations must be declared arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

145.    Plaintiffs are entitled to preliminary and permanent relief under the APA, 5 U.S.C. §§ 705, 706(2)(B), including an order holding unlawful and setting aside Defendants' terminations of Plaintiffs' grants and the suspension of Plaintiffs' access to the grant funds.

**COUNT IV**
**Fifth Amendment Due Process Clause**

146.    Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

147.    Under the Fifth Amendment, the federal government may not deprive a person or entity of property "without due process of law." U.S. Const. Amend. V.

148.    Plaintiffs have a constitutionally protected property interest in the funding they applied for, were awarded, and relied on. *See, e.g.*, *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub nom. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018). Plaintiffs' property interest is also established through Congress's appropriation of Anti-Hate Crimes Grant Program funds— codified in the Consolidated Appropriations Act, 2022, the Consolidated Appropriations Act, 2023, and the Consolidated Appropriations Act, 2024—and Plaintiffs' acceptance of their awards.

*Id.* (finding plaintiffs held a legitimate, constitutionally protected property interest in federal funds "that Congress has already appropriated and that the Counties have accepted.").

149.    Plaintiffs have already expended significant resources to set up their programs and projects in reliance on their Anti-Hate Crimes Grant Program awards. Plaintiffs' interest in their awards was established by the federal government's acceptance of their respective grant applications. *Id.*

150.    Defendants deprived Plaintiffs of their property interest in their awarded grant funds by dismantling the Anti-Hate Crimes Grant Program. By sending brief, boilerplate letters to Plaintiffs providing no reasoned and specific explanation for terminating the Anti-Hate Crimes Grant Program, Defendants denied Plaintiffs adequate procedural due process protections to which they were entitled, including sufficient notice and a reasonable opportunity to challenge the terminations.

151.    Regarding notice, the termination letters were sent to Plaintiffs at the exact same time on the exact same date, April 22, 2025, and provided that the effective date of grant termination was that same day. In other words, Plaintiffs had no realistic, meaningful notice or ability to prepare for this sudden termination of funding.

152.    Regarding an opportunity to challenge the terminations, Plaintiffs were told their only recourse was to appeal within 30 days and include "[a] brief statement of the argument that forms the basis of the appeal, and any disputed factual, legal, or other issues." Ex. 1. After submitting their respective appeals, Plaintiffs merely received form acknowledgments from DOJ. Plaintiffs have yet to receive any additional information regarding their appeal status or the appeal "process" as a whole, such as what any potential next steps would entail or a timeline for the DOJ's decision. Additionally, Plaintiffs have not been told whether they will be afforded a hearing, let

alone details that would enable them to prepare, such as when and before what body a hearing would take place.

153.    By unilaterally dismantling the Anti-Hate Crimes Grant Program, Plaintiffs were deprived of their legitimate claim of entitlement to Program funding in violation of their due process rights protected by the Fifth Amendment.

## COUNT V
### *Ultra Vires*

154.    Plaintiffs restate and reallege all paragraphs above as if fully set forth herein.

155.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions.

156.    Defendants may act only under authority conferred through statutes, regulations, constitutional provisions, or other sources of law. The equitable power possessed by federal courts to enjoin violations of federal law by federal officials includes when a federal officer has acted "beyond [the] limitations" defined by statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

157.    No statute, constitutional provision, or other source of law authorizes Defendants to withhold appropriated funds or dismantle an entire program for which Congress appropriated funding. *Cf. People ex rel. Bakalis v. Weinberger*, 368 F. Supp. 721, 726–27 (N.D. Ill. 1973) (finding funds Congressionally appropriated to plaintiffs were to "remain available until totally expended," the President's legislative power over appropriations came "to an end" after signing Public Law 92-334 into law, and there was no authority "either in Article II of the Constitution or in case law" supporting the President's purported power to withhold appropriated funds).

158.    To the contrary, the FY22 Appropriations, FY23 Appropriations, and FY24 Appropriations have consistently provided that funding for the Anti-Hate Crimes Grant Program

is to remain available until expended. Accordingly, Defendants' actions are contrary to specific Congressional appropriations legislation, exceed their legal authority, and are therefore *ultra vires*.

159.    The program defunding also contravenes the APA, and for that additional reason is also *ultra vires*. 5 U.S.C. § 706(2)(B); *New York v. Trump*, 769 F. Supp. 3d 119 (D.R.I. 2025) ("Any action an agency takes that is beyond the limits of its statutory authority is *ultra vires* and violates the APA.").

160.    Defendants' actions have caused and are causing substantial injury and irreparable harm.

161.    For the foregoing reasons, Plaintiffs are entitled to declaratory and preliminary and permanent injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court grant it the following relief:

a.    Declare unlawful, vacate, and set aside Defendants' dismantling and defunding of the Anti-Hate Crimes Grant Program through the *en masse* grant terminations, including Plaintiffs';

b.    Pursuant to 28 U.S.C. § 2201, declare the dismantling and defunding of the Anti-Hate Crimes Grant Program through the *en masse* grant terminations unconstitutional in violation of the Separation of Powers Doctrine, the Spending Clause, and the Appropriations Clause;

c.    Pursuant to 28 U.S.C. § 2201, declare the dismantling and defunding of the Anti-Hate Crimes Grant Program through the *en masse* grant terminations unconstitutional in violation of the Fifth Amendment's Due Process Clause;

d.      Pursuant to 28 U.S.C. § 2201, declare the dismantling and defunding of the Anti-Hate Crimes Grant Program through the *en masse* grant terminations unlawful and ultra vires because Defendants' actions exceeded their statutory authority;

e.      Pursuant to 28 U.S.C. § 2201, declare the dismantling and defunding of the Anti-Hate Crimes Grant Program through the *en masse* grant terminations on the basis of Section 200.340(a)(4) unlawful, including its interpretation that 2 C.F.R. § 200.340(a)(4) enables OJP to terminate grants based on a "change" in agency priorities;

f.      Pursuant to 5 U.S.C. § 706, vacate and set aside the dismantling and defunding of the Anti-Hate Crimes Grant Program through the *en masse* grant terminations and declare that these actions are arbitrary and capricious, an abuse of discretion, and contrary to law;

g.      Preliminarily and permanently enjoin Defendants, including their officials, their agents, and all persons acting in concert or participation with Defendants, from enforcing, implementing, maintaining or giving effect to: (i) dismantling and defunding the Congressionally appropriated Anti-Hate Crimes Grant Program through the mass termination of grants, including those awarded to Plaintiffs; (ii) implementing or enforcing the terminations, and (iii) reverting the grants to the Treasury or re-obligating and disbursing them elsewhere;

h.      Enjoin Defendants from imposing any negative consequences on Plaintiffs for noncompliance with the terms of their respective Anti-Hate Crimes Grant Program awards if such noncompliance is due directly or indirectly to any aspect of Defendants' dismantling of the grant;

i.      Pursuant to 5 U.S.C. § 705, stay the termination of the grants;

j.      Enter judgment in favor of Plaintiffs;

k.      Enter an order directing Defendants to reinstate the dismantled Anti-Hate Crimes Grant Program by restoring Program grants, including those awarded to Plaintiffs;

l.      Require Defendants to submit a status report within 24 hours of the entry of the Court's order, and weekly status updates thereafter, to ensure prompt and complete compliance;

m.      Award Plaintiffs' reasonable attorneys' fees, costs, and expenses pursuant to 28 U.S.C. § 2412; and

n.      Grant such other and further relief as the Court may deem appropriate.

July 2, 2025

Niyati Shah*
Noah Baron*
Shalaka Phadnis *
Alizeh Ahmad*
ASIAN AMERICANS ADVANCING
JUSTICE—AAJC
1620 L St. NW, Suite 1050
Washington, DC 20036
Phone: (202) 296-2318
nshah@advancingjustice-aajc.org
nbaron@advancingjustice-aajc.org
sphadnis@advancingjustice-aajc.org
aahmad@advancingjustice-aajc.org

Respectfully submitted,

/s/ Nimra H. Azmi
Nimra H. Azmi (Bar No. 5466693)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 21st Floor
New York, NY 10020-1104
Phone: (212) 489-8230
NimraAzmi@dwt.com

Kenneth E. Payson*
Christine McFadden*
DAVIS WRIGHT TREMAINE LLP
920 Fifth Avenue, Suite 3300
Seattle, WA 98104-1604
Phone: (206) 622-3150
KennethPayson@dwt.com
ChristineMcFadden@dwt.com

Anne Marie Tavella*
DAVIS WRIGHT TREMAINE LLP
188 West Northern Lights Blvd., Suite 1100
Anchorage, AK 99503-3985
Phone: (907) 257-5300
AnneMarieTavella@dwt.com

Megan Amaris*
Kendal Mitchell*
DAVIS WRIGHT TREMAINE LLP
50 California Street, 23rd Floor
San Francisco, CA 94111-4701
Phone: (415) 276-6500
MeganAmaris@dwt.com
KendalMitchell@dwt.com

*Counsel for Plaintiffs*

* *Motion for admission* pro hac vice *forthcoming*